1    **TRANSCRIBED FROM DIGITAL RECORDING**

2                    IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
3                          EASTERN DIVISION

4    UNITED STATES OF AMERICA,              )
                                            ) Case No. 25 CR 129
5              Plaintiff,                    )
                                            )
6              vs.                           )
                                            )
7    JOSE GREGORIO SOSA CARDONA,             ) March 12, 2025
                                            ) Chicago, Illinois
8              Defendant.                    ) 1:09 P.M.

9              TRANSCRIPT OF PROCEEDINGS - Detention Hearing
        BEFORE THE HONORABLE HEATHER K. McSHAIN, Magistrate Judge
10
     APPEARANCES:
11
     For the Government:        HON. MORRIS PASQUAL
12                              219 South Dearborn Street
                                Chicago, Illinois  60604
13                              BY:  MR. JEFFREY S. SNELL

14   For the Defendant:        MR. JACOB S. BRISKMAN
                                2054 North California Avenue
15                              Suite 1R
                                Chicago, Illinois  60647
16
     ALSO PRESENT:             Ms. Diamond Bert
17                             Pretrial Service Officer

18
                               Ms. Michelle Sosa
19

20

21                 PAMELA S. WARREN, CSR, RPR
                 Official Court Reporter - Retired
22                  23869 N. High Ridge Drive
                  Lake Zurich, Illinois   60047
23                       312.823.0001

24
     NOTE:  Please notify of correct speaker identification.
25

```
 1        (Proceedings held in open court:)

 2             THE CLERK:  25 CR 129, USA versus Jose Gregorio Sosa

 3   Cardona, for detention hearing.

 4             THE COURT:  Good afternoon.  Counsel, please state

 5   your appearance for the record, beginning with the government.

 6             MR. SNELL:  Good afternoon, your Honor.  Jeff Snell

 7   for the United States.

 8             THE COURT:  Thank you.

 9             For the defendant, please.

10             MR. BRISKMAN:  Jacob Briskman on behalf of the

11   defendant.

12             THE COURT:  Thank you.  And I'll note that the

13   defendant is present in court.

14             Mr. Briskman, just so I'm clear, the defendant prefers

15   to go by Mr. Sosa; is that correct?

16             MR. BRISKMAN:  Yes, your Honor.

17             THE COURT:  Okay.  Thank you for confirming that.

18             And for pretrial services, please?

19             MS. BERT:  Good afternoon, your Honor.  Diamond Bert

20   with pretrial services.

21             THE COURT:  Hi, Ms. Bert.  Thank you.

22             So we're here for a detention hearing.  Let me just

23   confirm both sides are ready to proceed.

24             Mr. Snell?

25             MR. SNELL:  Yes, your Honor.
```

1    THE COURT:  Thank you.

2    And Mr. Briskman?

3    MR. BRISKMAN:  Yes, your Honor.

4    THE COURT:  Okay.  I have a couple of questions that I

5 want to just go through, and then I'll hear argument.  This is

6 not a presumption case, so my intention is to start with the

7 government who bears the burden here.  I'll then hear from you,

8 Mr. Briskman.  And then, Mr. Snell, give you last words since

9 it is the government motion.

10    First question, I realize that Mr. Sosa has three

11 children, one with his first wife.  Where is that child

12 residing?

13    THE DEFENDANT:  Your Honor, she is at my house on the

14 weekends, at her mom's house in Naperville during the week.

15    THE COURT:  Okay.  So that daughter resides here in

16 the Northern District of Illinois?

17    THE DEFENDANT:  Yes, your Honor.

18    THE COURT:  And how old is she?

19    THE DEFENDANT:  13, your Honor.

20    THE COURT:  Okay.  I am confused, on page 2 of

21 pretrial services report.  This report says that the U.S.

22 Passport expired December of 2023 but that he traveled -- the

23 defendant, Mr. Sosa, traveled to Germany September of 2024.

24 How is that possible if the passport has expired?  I just want

25 to make sure, Ms. Bert, that's the information you have?

1    MS. BERT:  Yes, your Honor.  And I too was confused as

2    it is conflicting.  I spoke with Ms. Sosa, and we agreed that

3    it was kind of confusing.  She said she could not locate the

4    most recent passport, so she was unable to confirm when that

5    one expired.

6         But during the investigation -- or the interview --

7    sorry -- Mr. Sosa advised that that most recent passport

8    expired December of 2023.  So I'm not sure how if he is using

9    any additional travel documents or a birth certificate.

10   Forgive me for my ignorance, but I am not sure what you -- what

11   documentation you need.  I thought it was a passport for

12   Germany -- but that -- that's my understanding.  And it does

13   appear to be a confliction there.

14        THE COURT:  Mr. Briskman, are you aware of this -- I

15   know that the pretrial services report states that Mr. Sosa is

16   a United States citizen.  Does he have dual -- oh, he is not?

17        MR. BRISKMAN:  He's not.

18        THE COURT:  Oh, he's not.

19        MR. BRISKMAN:  He's not, Judge.  He's not a United

20   States citizen.  He's a United States legal permanent resident.

21   And Judge, he possess an unexpired Venezuelan passport.  And he

22   had some type of travel document that I am not sure if that's

23   expired or not.  It's -- it is -- it looks like a United States

24   passport, but it is not.  It's in a green book, and it is for

25   legal permanent residents to more easily pass through the

1    border.  So he does not have a United States passport.

2         THE COURT:  I'm confused about the pretrial services

3    report.  I'm not dis- -- I'm sure Mr. Sosa knows his own

4    status.  I'm just confused on why the ICE records state that he

5    was a U.S. Citizen, but that's what the search reflected.

6         MS. BERT:  Yes, your Honor.  It states that the

7    records indicate that he is a -- he's legally residing in the

8    United States as a permanent resident and he may work here.  So

9    that's the terminology that we referred to.  I would assume

10   that in a report like he is a -- performed during the

11   investigation, it would probably be like a naturalized citizen,

12   but that's how we refer to it during the reports.

13        THE COURT:  All right.  Then I just misunderstood.

14   And I -- but Mr. Briskman, were you going to say something

15   else?

16        MR. BRISKMAN:  I just -- he's a legal permanent

17   resident, not a United States citizen.

18        THE COURT:  Okay.  And as far as the Venezuelan

19   passport, where is that?

20        MR. BRISKMAN:  I think we have it here right now.

21        THE COURT:  Okay.  So that's -- that's been located?

22        MR. BRISKMAN:  Yes.

23        THE COURT:  And there is some other travel document?

24        MR. BRISKMAN:  Yeah.  I believe we have that as well.

25   Yes.

```
1              THE COURT:  Okay.

2              Page 4 of the pretrial services report, there is a

3    misdemeanor conviction.  I'm just confused about the timing.

4    The arrest was in 2013.  I just want to confirm the conviction

5    that was 2023 --

6              MS. BERT:  Your Honor, I -- as you may know, I have

7    been partnered with this.  So Officer Wirth completed the

8    criminal history section.  So from my understanding that is the

9    records that she obtained and entered into the pretrial

10   services report.  And I would be happy to confirm that as of

11   now if you'd like.

12             THE COURT:  Well, Mr. Snell, did you run Mr. Sosa's

13   criminal history?  Do you know, does that align with what you

14   have or your agent ran on the criminal history?

15             MR. SNELL:  Your Honor, we have run it.  I have not

16   put eyes on the criminal history since yesterday.  But my

17   understanding is the only conviction is from 2013.  I'm not

18   aware of a 2023 conviction.

19             THE COURT:  Well, this matters, because this is a

20   three year -- this is a sentence of three years of probation,

21   which would cover the time of the instant alleged offense,

22   which is a statutorily enumerated factor at this point in

23   detention.  So it is very important.  And I just want to make

24   sure this is right.

25             MR. SNELL:  We -- the government does not have
```

1    information about a 2023 conviction.

2         THE COURT:  Well -- could you contact Ms. Wirth?

3         MS. BERT:  Yes, your Honor.  I messaged her as of

4    right now.  So when she gives me a response, I can update you.

5         THE COURT:  Page 4 of the pretrial services report --

6         MS. BERT:  Your Honor, if I may?

7         THE COURT:  Yeah.

8         MS. BERT:  So she just confirmed that it was a typo.

9    So it is 2013, it is not 2023.

10        THE COURT:  Okay.

11        MS. BERT:  My apologies.

12        THE COURT:  That's okay.  And thank you.  Okay.

13        I don't understand the terminology on page 4 of the

14   report about the Department of Children and Family Services

15   investigation.  I don't understand what this means that was

16   involved and the case was unfounded.  "Unfounded," what does

17   that mean?

18        MS. BERT:  So essentially there was allegations posed

19   that required the Department of Family Services to do an

20   investigation on Mr. Sosa.  During the investigation there was

21   no evidence to determine that the alleged issue was actually

22   something that occurred.  So unfounded means --

23        THE COURT:  What's the alleged --

24        MS. BERT:  -- that the case was closed.

25        THE COURT:  Yeah.  Sorry to interrupt you.  Because, I

1  mean, this is in a paragraph with this heading about files of

2  suspected child sexual abuse material found on defendant's

3  personal computer.  So when it says that the investigation was

4  unfounded, does that mean like unfounded as to abuse of his

5  actual children?  But -- I mean, they are not saying that this

6  is not what it is.

7          MS. BERT:  So the information in -- and my apologies,

8  your Honor.  The information was given to us today, short of

9  the hearing, and so we were doing everything we could to obtain

10  as much information as possible.  I'm not sure if the AUSA can

11  speak to it in more direct manner as to what the alleged

12  conduct was to make them conduct an investigation.  I don't

13  know if it was related to the material or if there was alleged

14  actual activity against their child or some other child.  That

15  information was not provided to me specifically.

16          I just know that there was an investigation, and it

17  was confirmed by Ms. Sosa that it was considered unfounded,

18  which means there was no confirmation of any, like, wrongdoing,

19  and he was allowed to return to his home.

20          THE COURT:  Mr. Snell, have you talked to -- or has an

21  agent or have you talked to DC -- I'm just -- I just don't

22  understand what this means.

23          MR. SNELL:  Yes, your Honor.  An agent has spoken with

24  DCFS and been in contact with DCFS about this process.  I -- my

25  understanding was that DCFS interviewed Mr. Sosa's three

1　children here in the United States and did not find that they

2　were at risk or they were --

3　　　　THE COURT:  The children, those actual children?

4　　　　MR. SNELL:  Yes.  There was no risk there.  I don't

5　believe that there was any finding about, like, the foundation

6　of whether or not there was child pornography on the computer,

7　you know, (unintelligible) by DCFS because I don't believe --

8　they weren't provided with it (unintelligible) couldn't be.

9　　　　THE COURT:  Okay.  But then when this says, Mrs. Sosa

10　advised she was ordered to supervise any contact with the

11　defendant and their children during the investigation, so is

12　that ongoing?

13　　　　Mr. Briskman, do you know, like, what's --

14　　　　MR. BRISKMAN:  I -- I don't know if it is ongoing.  I

15　believe that it is not.  I believe when it is unfounded, that

16　means they don't have reason to believe there was abuse or

17　neglect, and they closed the case.

18　　　　MR. SNELL:  Your Honor, to that, my understanding is

19　that it was like a 60-day period that expired recently.

20　　　　THE COURT:  Okay.  Last question, is the government

21　moving on both risk of flight and danger to the community?

22　　　　MR. SNELL:  Your Honor, the government is moving

23　solely on risk of flight.  And with respect to the danger to

24　the community, the reason we're not moving on danger to the

25　community is that I don't have a specific -- because of the

1  DCFS interviews, which were based on CSAM on one device, I

2  don't at this point have a specific basis to allege risk to the

3  community.

4          I do think that it informs the defendant's own

5  calculus as to the exposure he faces to the United States that

6  it was on four other devices, and they were all in his personal

7  office behind a door that was looked.  One of them --

8          THE COURT:  We'll hear more about this.

9          MR. SNELL:  Okay.

10         THE COURT:  It is okay.  And I'm anticipating hearing

11 more about this.  But I just want to be clear on the basis for

12 what the government is moving, and it is just for risk of

13 flight, correct?

14         MR. SNELL:  Correct.

15         THE COURT:  Okay.  And then finally, are there unnamed

16 co-conspirators referenced in the indictment?  I just want to

17 confirm because Mrs. Sosa is a proposed third-party custodian.

18 Is she alleged to have any involvement with the scheme?

19         MR. SNELL:  No, your Honor.  Ms. --

20         THE COURT:  Okay.

21         MR. SNELL:  The government does not allege that.

22         THE COURT:  Okay.  Mr. Snell, you may proceed.

23         MR. SNELL:  Thank you, your Honor.  Your Honor, the

24 government submits that there is no condition or combination of

25 conditions that can reasonably assure the defendant's

1    appearance at trial in this matter.  And for the reasons that I

2    am going to go into now submit that the government can meet its

3    burden of proof by a preponderance of the evidence concerning

4    that risk of nonappearance.

5         The defendant is charged in a seven count indictment

6    presently with various defenses relating to immigration.  The

7    first count being the overarching conspiracy to defraud the

8    United States and to violate immigration laws, specifically 18

9    USC Section 1546.

10        The next four counts are specific instances of alleged

11   violations of 1546.  And the last two counts concern false

12   representations made to government officials.

13        The -- with respect to the conspiracy, the -- and this

14   just goes to the nature of the alleged offense.  It is quite a

15   large conspiracy in the sense of number of fake documents,

16   number of fraudulent applications.

17        And the smaller of the types of applications is the

18   I-918 U-Visa applications, of which there were only six total.

19   Four of those have been confirmed to be fraudulent.

20        Three of which have forged signatures from law

21   enforcement officers within the Chicagoland area.  The fourth

22   has a fake FBI agent or FBI investigator as is listed on the

23   document from Miami.

24        The much larger category is the asylum applications.

25   And I do not, as I sit here, have an exact count of how many

1   are fraudulent because the government is continuing to pair

2   Word documents of these support documents, medical reports,

3   police reports, political party letters, to documents that have

4   been filed with USCIS.  And I guess I should be more clear,

5   these Word documents purport to be Venezuelan -- of Venezuelan

6   origin predominantly.  Although there are multiple instances

7   where there is fabricated documents from other countries.

8           But these documents being on Mr. Computer -- or

9   Mr. Sosa's computer system is specifically, I think in large

10  part, on a DropBox document.

11          So those are being paired.

12          The -- but just a rough sense of the scope -- and that

13  is not saying that each application is fraudulent.  But between

14  2020 and 2024, mid 2024, July, there are 422 asylum

15  applications filed through his Delta Globale Solutions Company.

16          There were additional applications he constantly filed

17  using the name Sin Fronteras -- that's S-I-N, F-R-O-N-T-E-R-A-S

18  -- and Enlace, E-N-L-A-C-E, which were apparently doing

19  business as names that the -- that he was causing to be used.

20          The pairing of the documents is simply finding the

21  Word document and then pairing it to a PDF that was filed

22  with -- or a copy of document in the USCIS records.

23          In addition to that, there are instances where we

24  don't have Word documents but we know that documents are

25  fraudulent for other reasons.  For instance, there is 24

1  political party letters from a specific political party in

2  Venezuela, Voluntad Popular.  And one of the founders of that

3  party is a real person, and he's here in the U.S.  And he has

4  been interviewed and said these -- this is not a signature,

5  these aren't real.  So it is not just for documents that we're

6  verifying all of these.

7         Then there are -- as I mentioned, there is some

8  documents from other countries that we have been able to verify

9  by going to those countries.  When the U.S. has relations with

10 a country, we can do that.

11        With Venezuela, since there is not formal relations,

12 as I understand it, at least, we're not able to frequently

13 verify the authenticity of documents independently.  But based

14 on the protocol by which he was saving documents in his

15 computer systems, you can see like whole categories.  He would

16 save that, you know, with the party name or with the document

17 type name, and then the client after.  So that we can see whole

18 categories that have not -- or whole groups of documents that

19 have not yet been paired to this point.

20        And the thing about this alleged immigration fraud

21 conspiracy that I note is that it was not at all altruistic.

22 It was not a misguided effort to try to help people, even

23 though he was filing fraudulent applications, it was all about

24 money.  And a significant amount of money.  Mr. Sosa charged

25 clients thousands of dollars.

1          And he was extremely aggressive in collecting it, when

2     he needed to be, which included in one instance in 2019, which

3     predates the conspiracy, but it was -- the charged conspiracy

4     at this time -- but it was Mr. Sosa specifically, he not only

5     sent the client a fake lawsuit document from DuPage County

6     claiming to sue him, but also sent a letter to USCIS reporting

7     the client for immigration fraud when he hadn't paid Mr. Sosa.

8          But anyway, with respect to the amount of money

9     Mr. Sosa has been making from this, to provide an example, his

10    revenues in 2023 or reported revenues were over a million

11    dollars, about $1,051,000.  And in 2022 they were $1,048,000.

12    And then there was also several hundred thousand dollars in

13    translation fees over and above that.

14          And in that business also has issues in the sense that

15    there is a number of translators listed on the certificate of

16    translations which are required for any document in a foreign

17    language filed with USCIS.  And these -- many of these people,

18    with one exception, were actually just Mr. Sosa who would just

19    copy and paste signatures, it is the government's

20    understanding.

21          So the business was shot through with deception.  And

22    not just deception in the product that was sold to clients and

23    then submitted to USCIS, which were the fraudulent

24    applications.  The clients, I think, almost entirely -- there

25    could be an exception here or there -- the clients were all

1    deceived into believing Mr. Sosa was an attorney because he

2    held himself out as an attorney.

3         He did that with his employees as well.  And that was

4    important because in Illinois immigrant petition preparers are

5    (unintelligible) to get the fees they can charge.  I believe it

6    was $10 per document.  So he is charging substantially in

7    excess of that.  And there were certain categories excepted

8    from those regulations, and that would include attorneys, and

9    he's impersonating an attorney.

10        In addition to clients and his employees being

11   deceived that he's an attorney, on at least two occasions he

12   even showed up at the United States Citizenship -- USCIS

13   offices and presented a fake Ohio bar card.  In the book of

14   exhibits that I have today, it is Exhibit 1, and specifically

15   page 9 of Exhibit 1, that is a photocopy of his driver's

16   license and the bar card that he presented on April 17th of

17   2024 when he was at USCIS offices.  And this comes up -- this

18   incident in April comes up later with respect to continuing

19   false representations by Mr. Sosa.

20        But I note at this point this fake Ohio bar card, at

21   the time Mr. Sosa's office was searched on November 21st, 2024,

22   the Pronto Magicard machine that this type of card was created

23   on, was seized from his office.  And within the shred bin of

24   his office there were multiple bar codes from Ohio and

25   California that were shredded and reconstructed by an HSI lab.

1    And notwithstanding all of that, I mean, as recently

2   as three weeks ago, Mr. Sosa represented to USCIS that he was

3   not at the USCIS offices on April 17th, 2024.

4    The document that I have got marked as Government

5   Exhibit 2 --

6    THE COURT: Can I just confirm, so the record is

7   clear? You -- I had a binder delivered to chambers. I'm

8   assuming it is Government Exhibits 1 through 11.

9    MR. SNELL: It is.

10    THE COURT: I just want to confirm, Mr. Briskman, did

11   you get a copy of those same exhibits?

12    MR. BRISKMAN: Yes. Yes, we do.

13    THE COURT: Okay. Thank you.

14    I'm sorry to interrupt you. But can you just go back

15   for a minute. You said as recently as three weeks ago Mr. Sosa

16   represented to USCIS. What did he represent?

17    MR. SNELL: Yes, your Honor. And that is an exhibit

18   that is -- his representation from, I believe it was, February

19   14th to -- I probably misspoke. It was four weeks ago. It

20   is -- so Exhibit 6 is a -- so just to sort of set the

21   circumstance for this. Mr. Sosa had a citizenship interview on

22   October 26th of 2024.

23    THE COURT: His own? Sorry. For one of these

24   purported clients or his own?

25    MR. SNELL: No, his own --

1    THE COURT:  Okay.

2    MR. SNELL:  -- citizenship interview.  And

3  he -- during that citizenship interview, he was asked about a

4  number of things.  And one of the things he was asked about was

5  appearing at USCIS offices in April of 2024 and presenting

6  himself to be an attorney.  And he was identified at that

7  interview in October by a hearing officer from April.  And he

8  made statements that it wasn't him, that somebody had -- and

9  I'm paraphrasing.  I actually have his statement specifically

10  within what I have got as Exhibit 9, which is his sworn

11  statement from October 26th.  But he essentially suggested that

12  somebody had impersonated him and stolen his ID, impersonated

13  him, on the 26th of October impersonating an attorney at USCIS

14  offices.

15    And so after that October 26 interview, USCIS had made

16  a determination that they were going to deny his citizenship

17  application.  And so Exhibit 6 is -- it begins with the notice

18  of intent to deny dated January 13th that is a document that

19  USCIS caused to be sent to Mr. Sosa.  And then with -- also

20  within the same exhibit -- and I mean, as part of that I would

21  note on page 13 of Exhibit 6, they provided him pictures

22  that -- the photographic evidence that they had that he was

23  there.

24    And then he provided his response, which starts at

25  page 17.  And this was submitted -- as I understand it was

1   received February 19th.  His response was attached to his

2   attorney's letter, which was dated February 14th.

3          So that was my reference to several weeks ago.  And it

4   was in this response where he says that he could not have been

5   at USCIS offices, he was with his father in Hinsdale on October

6   17th, among other things that he talks in that response that I

7   will get to in a little bit.

8          But that's what I was referring to that he continues

9   to deny this, even though there is photographic evidence he was

10  there.

11         The documents that he -- the fraudulent bar card that

12  was photographed on April 17th, the card printer that was found

13  in his office at 108B in Lisle, Illinois, and there were shreds

14  of bar codes, Ohio bar codes and California bar codes in his

15  shred bin.

16         Now moving on to -- well, the strength of the evidence

17  in this case I think is very strong, and it includes the

18  electronic evidence as well as witness interviews and other

19  evidence of that sort.  And I think that it is very relevant to

20  defendant's risk of flight here is that defendant has tried to

21  eliminate a lot of the evidence and I think is not aware of the

22  extent that the government has evidence based on his own

23  actions to try to prevent that.  And in that I think it goes to

24  the defendant's character.

25         And by his actions, the defendant has demonstrated a

1   propensity to lie; to use the identities of others to create

2   fake documents, including IDs to try to further his own goals.

3   And this extends well beyond the immigration fraud conspiracy.

4   It was for financial gain charged in this case.

5          And it appears to permeate near every aspect of his

6   being.  For instance, the defendant has credit established

7   under five different Social Security numbers, one of which is

8   assigned to him.  But dozens of different credit cards, auto

9   loans had been opened using Social Security numbers that are

10  not defendant's numbers.

11         And almost every application that we have seen has

12  some sort of listing of whether it is his profession, his

13  Social Security number, or otherwise.

14         But the -- with respect to the specific evidence in

15  this case and what defendant perceives it to be, I think there

16  is three episodes that are particularly important where

17  defendant tried to destroy evidence in this case.  And the

18  first is in Government Exhibit 3, which are screenshots of text

19  messages that the government has obtained.  And the first

20  page -- and I should note, so we received these screenshots and

21  they are in Spanish.  One is Exhibit 3 is Google Translates,

22  translation of that Spanish.  So I don't myself speak Spanish

23  so I'm relying on what Google says the Spanish words said.

24         But the -- I note this first text message is

25  November 21st at 11:00 A.M.  Now the search at defendant's

1    office started at 9:45 A.M.  And a number of -- the defendant

2    was told he was free to leave.  He did not leave for a while.

3    He was eventually dropped off at his home by HSI at about 10:52

4    A.M.  So it took about eight minutes for the defendant to text

5    an employee who was not at work that day and inform the

6    employee that he said, I hope you're not at home.  You don't

7    know anything.  We are closed.

8           After the employee said, I'm at home.  What happened?

9    And then four question marks.

10          The defendant told him, go out, have a coffee.  Wait

11   until the afternoon.  Not a word to anyone.  And the defendant

12   followed up providing further -- or statements.  And these text

13   messages are what we have.  They are not a continuous sequence.

14   I'd note that.  So this is a compilation exhibit.

15          But turning to the second page, which are text

16   messages from Mr. Sosa and the same individual, the individual

17   tells him, well, these people keep calling me to question me.

18   And it is the government's understanding from the person who

19   made that statement that he was specifically referring to

20   federal agents.

21          And Sosa responds, yes, they will surely ask you about

22   the ID card and your TPS.  They went to where you lived with my

23   dad looking for you the day they went to the office.  And these

24   messages are on November 23rd so they are two days after the

25   search had happened.

1    Now that ID card that's referenced is a fake ID.  It

2  was created by Mr. Sosa that purports to be an identification

3  card created by a Venezuelan government agency that was

4  presented in support of that TPS application.

5    And then the text below where he says -- Mr. Sosa

6  says, I wanted to stop by there to delete the Mac.  You give it

7  to Mariana (phonetic).  And that's specifically the Mac book

8  that was the employee's computer for work that Mr. Sosa wants

9  to delete it, according to the government's understanding from

10  the party who was given that direction.

11    And on page 4 of the Exhibit 3, there is again

12  reference, this time on November 26th, where the employee says

13  to Mr. Sosa, I'm just waiting for the meeting so I don't have

14  to talk so much more -- or so much here.  It is my

15  understanding that that meeting was the interview with agents

16  who were trying to interview him.

17    And Mr. Sosa says, did you see the guy?  And then

18  later that day says, delete it anyway, which I understand

19  pertains to the Mac.  And it is the government's understanding

20  that the employee took the Mac to the offices where it was

21  caused to be deleted.

22    THE COURT:  By whom?

23    MR. SNELL:  I believe the employee did it at

24  Mr. Sosa's direction.  However, before that was deleted,

25  everything had been backed up because the employee had been

1  served with a grand jury subpoena and he was reluctant,

2  apparently, to follow Mr. Sosa's direction.  So the government

3  has, what I understand, without personally seeing the total

4  size of it, is 180 gig of materials, including Word documents,

5  for these -- the alleged offenses in the conspiracy.

6      The next exhibit, which I marked as Government

7  Exhibit 4, is a report from HSI.  And it specifically concerns

8  an iPhone 15 that was Mr. Sosa's iPhone.  There were several

9  phones in his office within 108B.  And just to, I guess, step

10  back for a second.  The search that was conducted on

11  November 21st, 2024, was of three units.  And it was 108A,

12  108B, 108C.  These were three offices within a larger shared

13  common office space that Mr. Sosa rented for his business.  And

14  108B was Mr. Sosa's office.  There were biometric locks on the

15  doors to each -- I believe each unit.  Certainly 108B and -- it

16  is the government's understanding that Mr. Sosa kept that door

17  locked.  It was locked when agents arrived at 9:45 A.M. on that

18  day.  And Mr. Sosa was inside.

19      And one of the phones that was taken that day was the

20  iPhone 15.  And it was transported back to HSI, as reflected in

21  this report.  And by the following day when it was moved from

22  one bag to another, one Ramsey RF enclosure, the iPhone had

23  been remotely wiped it indicates.  Or the exact language

24  is -- let's see -- remotely factory reset.  And that's still

25  under investigation.  However it was Mr. Sosa's phone, and it

1  was remotely factory reset shortly after it was seized in

2  execution of a search warrant.

3          Exhibit 5 are emails that were taken of

4  Mr. Sosa's computer that appeared to have been sent from

5  GoDaddy dot com to Mr. Sosa's gmail account on November 21st,

6  the (unintelligible) 53 P.M., so the evening of the search that

7  indicate that email addresses were removed or deleted and

8  confirming that fact.  Since the email was being sent to

9  Mr. Sosa's own gmail account, the inference the government

10  draws is that Mr. Sosa was deleting these email addresses for

11  his businesses.

12          And the first one --

13          THE COURT:  Can I just ask a question?  When you say

14  deleting email addresses, do you mean deleting also the content

15  of the accounts?

16          MR. SNELL:  I believe so, but I don't know.  I have

17  not interviewed anyone for -- to my understanding, we have not

18  yet taken steps to interview GoDaddy about this.  It says in

19  the text of this email as requested to Microsoft 365 user

20  account associated with the following email address has been

21  deleted.

22          The first e-mail is Melissa Homan, M-E-L-I-S-S-A dot

23  Homan, H-O-M-A-N, at Delta Globale dot com.  And I would just

24  note for a second that this is -- because it becomes relevant

25  later to something that's been ongoing.  This is to the

1    government's understanding not a real person.  This is an

2    identity that Mr. Sosa uses to communicate with his employees

3    and make -- I think he leads the employees to believe it is a

4    real person.  It is a real person supervising them or answering

5    their questions, but it is actually Mr. Sosa.  And Melissa

6    Homan is represented to these employees to be an attorney who

7    answers their various questions.

8         Now I think also speaking to the general observation

9    that Mr. Sosa is -- has a general propensity to try to avoid

10   consequences for things, which I think informs his risk of

11   flight, is what I have marked as Exhibit 6, which is the

12   response to the notice of intent to deny citizenship.  And

13   there -- at that October 26, 2024, interview, there were a

14   number of apparent lies that Mr. Sosa had been caught in by the

15   examining officer.

16        And one of them regarded Mr. Sosa's marriage and the

17   fact that Mr. Sosa was married to a woman at the same time that

18   he married his current wife in California, which made his

19   current marriage invalid.  And Mr. Sosa has maintained that he

20   and -- and this is raised because in Mr. Sosa's asylum

21   application filed in or around 2009, he admitted he was married

22   to his first wife.  But by the time he was filing for

23   citizenship, he said that he had only ever been married once,

24   and that was to his current wife.  So he had inconsistent

25   statements within his own documents.

1    And the immigration officer had confronted Mr. Sosa

2  with the fact that he was married in Dayton, Ohio in 2008.  And

3  he got married then in California in 2015.  And then a few

4  months later in 2015 filed for divorce from his first wife in

5  DuPage County, Illinois.

6    And in this document --

7    THE COURT:  Can I just confirm -- I'm sorry.

8    MR. SNELL:  Yes.

9    THE COURT:  So you're not talking about a third

10  person, you're talking about the first marriage is of Ajenia

11  Lomenskya (phonetic) Sosa, but that he was still married --

12  legally married to that woman when he married Michelle Sosa?

13    MR. SNELL:  Yes, your Honor.

14    THE COURT:  Okay.

15    MR. SNELL:  And so on page 19 -- and so -- I'm sorry,

16  before I get there.  Mr. Sosa's -- his explanation for this has

17  been that he thought that he was married to Ms. Lomenskya, but

18  then he learned that the paperwork had never been filed with

19  the clerk and so they found out after the fact that in fact

20  they had not been married.

21    And he has been stating that for years.  But it is --

22  the evidence would indicate that he knows that that is not

23  true.  He has presented a -- what's been represented to be a

24  certificate of, like, no record to USCIS.  But Montgomery

25  County, Ohio, has confirmed that that document is not real.

1          And so on or around February 14th, 2025, when

2   Mr. Sosa's statement was appended to his attorney's letter and

3   sent to USCIS, he said in his statement -- and I'm looking at

4   page 19 -- he says, quote, I provided evidence of no record in

5   my USCIS 130 interview and at my I-485 adjustment of status

6   interview.  I'm attaching those records to this response as

7   well.  And this is with respect to his marriage.

8          And what he attached to this document is what is found

9   at page 42 of the exhibit.  And that is simply what appears to

10  be a website printout that says, no matches were found, please

11  go back to previous form and try again.  Which I think is

12  different from what he submitted to the USCIS.  Or it is my

13  understanding is different from what he submitted to USCIS

14  before about an absence of record.

15         But what's important about his statement in February

16  of 2025 is that when the search was conducted of his office on

17  November 21st, 2024, among the items in his office was a

18  certified copy of the abstract of marriage from Montgomery

19  County, Ohio.  And the date of the certification on that

20  document was October 28, 2024.  So two days after the interview

21  with USCIS regarding citizenship.  And also present was an

22  undated request for certified records to Montgomery County,

23  Ohio, that misspelled his first wife's first -- her name and

24  then misstated the date of the marriage, which the government

25  infers was an attempt to obtain from Montgomery County a

1   certificate of no record, but they found the record and sent it

2   to Mr. Sosa and it was in his office.

3          So he had the record knowing full well that he was

4   married when he submitted this statement to USCIS just a few

5   weeks ago.

6          And I think it is also important to note too that in

7   the context of doing this, he had already -- he was well aware

8   that there was an investigation occurring by virtue of the

9   execution of the search warrant.  But he persisted with that.

10          Now another example of Mr. Sosa's -- the great lengths

11   and extreme acts that he's willing to go to to avoid

12   consequence for things is just 11 months ago Mr. Sosa

13   impersonated another attorney, someone named Amiel Wade,

14   A-M-I-E-L, Wade, W-A-D-E.  And this was apparently to try to

15   escape consequences for a personal matter.

16          And Mr. Sosa -- I have got Exhibit 7 -- is a

17   compilation of emails that were just drawn -- emails and other

18   documents just drawn from Mr. Sosa's computer yesterday evening

19   for this hearing where Mr. Sosa went to the lengths of forming

20   or having created an internet domain name very similar to Amiel

21   Wade's actual internet website for his law practice so that he

22   could impersonate Mr. Wade to send messages to Mr. Sosa's own

23   wife and deceive her that an affair that Mr. Sosa had had was

24   the result -- was involitional (sic) or involuntary and

25   Mr. Sosa was being extorted by the woman he was having the

1   affair with into having that relationship.

2          And so these series of documents on

3   Government Exhibit 7 first can be seen on March 31st, 2024, an

4   email from the fake Amiel Wade account to Sosa's own accounts

5   where he writes, just testing the server.

6          Then on page 2 is a substance of an email that it

7   appears was at some point sent to Mr. Sosa's wife where it is

8   from the Amiel Wade account but to Mr. Sosa's emails.  And the

9   difference in the domain address is from the fake Wade law

10  website and the real one are shown in the from line is Wade

11  hyphen law group dot com and the real website is actually in

12  the signature block Wade litigation dot com.

13         And the substance of that email that was on that page

14  is seen on page 3 as the Word documents and it looks like it

15  was slightly -- the wording was slightly changed once it made

16  it into at least that test email.  But the word data shows at

17  the bottom of the creator Jose Sosa on April 1st, 2024.

18         And then page 4 of the exhibit is login information

19  through Chrome for an April 2nd, 2024 login to use that email

20  address on GoDaddy.

21         And then an email that we do know was sent to

22  Mrs. Sosa from the fake domain that Mr. Sosa created is on page

23  5 where he purports to be someone named Amanda Torrealba,

24  T-O-R-R-E-A-L-B-A, who is listed as an office assistant from

25  Wade Law Group.  And all of this -- the -- or I should before I

1   go on.  The last page, page 6, is the login for that email

2   address with the GoDaddy site from the Chrome web browser on

3   Mr. Sosa's computer.

4        And all of this was to perpetuate this story about

5   extortion into a relationship that was kept up with fake court

6   documents that are the Government's Exhibit 8 from Harris

7   County, Texas, where it is represented that Mr. Sosa's

8   girlfriend is a defendant in a criminal matter, which is

9   strange because it is captioned almost as a civil matter.

10        THE COURT:  Wait.  Just to be clear, fake girlfriend

11   or real girlfriend?

12        MR. SNELL:  Real -- I apologize, real girlfriend.

13   Fake lawsuit; real girlfriend.

14        THE COURT:  I'm sorry, so this -- I'm following that

15   this attorney is made up.  These communications with Mrs. Sosa

16   you're alleging were defendant.  But he has a girlfriend on the

17   side, a real live girlfriend?  This is not all made up?

18        MR. SNELL:  Several, yes.

19        THE COURT:  Okay.

20        MR. SNELL:  And your Honor, this individual, this

21   purported defendant I'll note too, Mr. Sosa was arrested at

22   around 8:35 A.M. on Monday.  She was at the office shortly

23   thereafter.  I -- the extent that he went to in writing the

24   story on the 22 pages of this document that purports to be a

25   filing in Harris County, Texas is -- it is very detailed and

1  very imaginative.  He clearly spent a lot of time

2  creating -- creating this story and situation.  But the fact is

3  that it is another instance where he creates court documents to

4  try to evade responsibility or consequence for his actions,

5  which is a concern with respect to his appearance.

6          THE COURT:  Sorry.  Sorry, I'm not just tracking how

7  this goes to trying to evade consequences.  So that this

8  lawsuit was made up so that his wife thought he was being

9  extorted and that it wasn't a real affair, is that the point?

10         MR. SNELL:  Yes, your Honor.

11         THE COURT:  Okay.

12         MR. SNELL:  Yeah, I -- I have read part of it.

13 It -- I mean, I have scanned the whole thing.  It is a story

14 that he says that he was neglected in his marriage so he hired

15 her -- so he paid a woman --

16         THE COURT:  I have read it.

17         MR. SNELL:  Okay.

18         THE COURT:  I mean, if you want to make your record,

19 you can put it in the record, but you can assume that I read

20 it.

21         MR. SNELL:  Okay.  Yeah, it is just a story to evade

22 consequences of that.

23         And it also goes to -- I guess, fast forwarding a

24 little bit.  So the government does not believe that there is

25 any condition or set of conditions.  And that includes the

1    custodian.  And the government -- your Honor asked at the

2    outset if the government considered Ms. Sosa to be an

3    unindicted co-conspirator.  And the government does not.  The

4    government does not think that Mrs. Sosa is aware of many

5    things that Mr. Sosa is doing and has done.  And that's why the

6    government -- this lawsuit though is further indication of why

7    the government thinks that Mr. Sosa is really not possibly

8    supervisable by a custodian because he will go to any lengths

9    and quite creative lengths and imaginative lengths to try to

10   deceive.

11          Ms. Sosa -- moving on to Mr. Sosa's ties to the

12   community.  His ties to the United States have been reduced,

13   and albeit that's involuntary.  He wants to be here in the

14   United States, that's clear.  But over the last five months, it

15   has become progressively more clear to him, or it should have,

16   that he is unlikely to be permitted to remain in this country

17   after the criminal case concludes.

18          He obtained his legal status unlawfully.  And he has

19   been specifically told this by the USCIS at his adjustment of

20   status -- or I'm sorry -- at his citizenship interview.  He was

21   told that he obtained his legal status unlawfully and that his

22   adjustment of status, which he previously achieved, his Green

23   Card, his legal permanent residence card, was unlawful due to

24   the marriage upon which it was based, his current marriage.

25   And that's on what I have marked as Government Exhibit 9, which

1    is the sworn statement, record of sworn statement that is made

2    on October 26th, 2024.  And the marriage was discussed in this.

3    The April 17, 2024 appearance and presentation as an attorney

4    was discussed by Mr. Sosa under oath and a number of issues

5    were raised.

6           But at the end of that interview or towards the end,

7    on maybe page 11 of 12 in the lower right-hand corner, the

8    officer says to him, also, if your marriage to Michelle was

9    invalid and your adjustment of status is not lawfully obtained

10   because you and Michelle were not married at the time you

11   obtained your residency, do you understand that?  He says now I

12   do.  And he's been put on notice with that and with the whole

13   course of that interview, which I think did not go well from

14   his perspective that his stay in the country is tenuous at

15   best.

16          He has ties, substantial ties to other countries, most

17   specifically Colombia.  And the -- he has traveled to Colombia

18   by my -- by the information I have received, eight times since

19   November 16th of 2020.  And the government -- it is the

20   government's understanding that Ms. Sosa has a girlfriend and a

21   child in Colombia.  And this was information provided by

22   various witnesses.  And in doing -- in looking at

23   communications, this appears to be the case.

24          And the woman named Angi Perez, A-N-G-I, Perez,

25   P-E-R-E-Z.  And the email that is marked as Government Exhibit

1   10, this is again a Google translation of a document that was

2   written in Spanish.  But there is reference in this email, and

3   I believe in several other communications, to someone named

4   Sam.  And it appears to the government that Sam might be

5   Ms. Sosa's son because we have heard from witnesses that he has

6   a son in Colombia, a young son.  And this email references

7   giving Sam a better education.  And the sender, Ms. Perez,

8   wanting to share that with Mr. Sosa.

9        And with respect to his other travel -- Exhibit 11 is

10  the government's -- is an exhibit that is -- that we obtained

11  from CBP yesterday, which is the travel history of entries and

12  exits from the country.  And then Exhibit 12 is a collection of

13  certain -- they have provided us notes from select encounters.

14  We did not get all the notes.

15       But the first document on Exhibit 12, at first page,

16  page 1 is for a contact that was on March 8th of 2024 when

17  Mr. Sosa went to Colombia.  And it says there that he had gone

18  on a trip and he claims he was renewing his passport.  And as I

19  understand it now today, it is acknowledged that he has a

20  Venezuelan passport, which is consistent with the government's

21  understanding that he does have one.

22       And the issue too, the bigger issue with that passport

23  and with his ability to obtain such a passport, is that he can

24  turn over his Venezuelan passport today, but that doesn't stop

25  him from going to a consulate and obtaining another one

1  tomorrow.  And that's a -- that's a very real concern for the

2  government because Mr. Sosa has the contacts with Colombia and,

3  according to other contact -- (unintelligible) for example, I'm

4  on page 3, he had reported that he went to Colombia to visit

5  his father, and then Panama to visit cousins.  And that's at

6  the bottom of the contact on page 3 which was a March 15th,

7  2023 contact.

8         And so the government believes that he has contacts

9  throughout -- throughout the world.  Just different family

10 members and whatnot.

11        Going next to page 6, there is reference to other

12 cousins that he visited outside the U.S. on his more recent

13 trip to Germany.

14        And Erwin Ramos, the cousin who is referenced here,

15 when I mentioned before about the translation business and the

16 identity of translators, it is the government's understanding

17 that Erwin Ramos is the only real translator outside of

18 Mr. Sosa, who does it under his own name as well as under

19 aliases.  But Erwin Ramos lives in Spain.

20        And so the defendant's past conduct to the government

21 demonstrates a willingness to engage in unlawful conduct, even

22 though he knows he's under a microscope, which strongly

23 suggests that he's not willing to comply with any conditions of

24 release.

25        And the nature of the defendant's past obstructive

1    acts also speaks to his capacity to produce and procure fake

2    documents that would assist in his flight. The creation of

3    fake documents is something he has been doing for a living and

4    is something that he has done just for his own personal life.

5    And the creation of fake court documents is also concerning

6    because especially in this case a custodian -- it is not only

7    conceivable that Mr. Sosa would create fake documents to

8    countermand the real documents from the Court and deceive a

9    custodian, but I think it would be consistent, his general

10    approach to problems which is to just lie and create fake

11    documents.

12        It is -- the government respectfully submits that

13    there is no condition or combination of conditions that will

14    reasonably assure the defendant's appearance, and for that

15    reason the defendant should be held in custody pending trial.

16        THE COURT: Mr. Snell, so the search was on

17    November 21st of 2024. And I realize that some of this

18    information you discussed on the record today was not readily

19    available. Like a lot of this was pulled recently from

20    computers, et cetera. But the fact is that on November 21st,

21    Mr. Sosa knew that he was under investigation and he didn't

22    flee. And I expect that I am going to hear a lot about that

23    point from defense counsel.

24        So if he is this serious risk of flight given his

25    proficiency for, you know, fake documentation, creating fake

1    documents, per these allegations, seems to have no hesitation

2    making up names or signing -- you know, faking signatures, et

3    cetera, and he could have fled and he didn't, I mean, how do

4    you answer that?  Like what is changed and/or why didn't the

5    government just complaint him?  I realize it takes time to

6    build an indictment.  This is a very detailed speaking

7    indictment.  There is a lot of pieces to it.  But you didn't

8    complaint him.  Like you waited to indict the case.  It is now

9    March.  What's changed?

10          MR. SNELL:  Yes.  Several things, your Honor.  And

11   with respect to the timeline, so...

12          THE COURT:  Which I'm not being critical.  Again, I am

13   very sensitive to the fact it takes a long time to build white

14   collar cases, and this is a very detailed indictment.  Like I'm

15   not being critical.  It is just he didn't flee.  So what's the

16   response?

17          MR. SNELL:  Right.  Well, and in -- I mean, a big part

18   of the issue with the timeline here is that he's impersonating

19   an attorney.  So everything we do has to proceed as if he was

20   an attorney.  And so we have filter teams, and so that's

21   the -- with respect to the slowness of evidence.

22          But with respect to the lack of flight, I think that

23   there is really two key things.  Before the government learned

24   about the obstruction, before the government learned about the

25   seizing the amount of computers, Mr. Sosa reached out to his

1  counsel and asked if he could turn himself in when, as, and if

2  the government decided to charge him.

3          THE COURT:  Sorry, when was that?

4          MR. SNELL:  Prior to the discovery of the obstruction

5  and the child pornography.  This was in November.

6          THE COURT:  Okay.

7          MR. SNELL:  He retained counsel.

8          THE COURT:  So shortly after the search?

9          MR. SNELL:  Yes.

10          THE COURT:  Okay.  Sorry.  Go ahead.

11          MR. SNELL:  And he was -- asked if he could turn

12  himself in.  Give notice if the government decided to charge

13  him.  We just said, yeah, generally we do that, absent a reason

14  not to.  So that's number one.  He thought he was going to have

15  a heads-up if we were going to charge him before we did.

16          Reason number two --

17          THE COURT:  And you didn't provide that -- sorry.  You

18  didn't provide that because of what you learned in the

19  evolution of the investigation?

20          MR. SNELL:  Yes, your Honor, because of what we

21  learned I was not able to do that because we were concerned

22  about flight.

23          And then the second reason is that I think -- well, I

24  guess there is really three reasons.

25          But the second was -- the most immediate one is, I

don't know how successful he believed he was with destroying evidence. He certainly gave it a lot of effort. And he might have thought that he did a much better job than he turned out to have done. But he thought that he had deleted a lot of records that he in fact hadn't managed to get rid of.

And then I think number three is just a general -- he seems to, as evidenced by the way he handled the notice of intent to deny his citizenship application, he seems to cling to the idea that he'll be able to convince people with more fake evidence and more false stories that he did not do what he's accused of, in that instance having two marriages simultaneously, pretending to be an attorney at a USCIS office, et cetera, that he essentially would be able to lie his way out of it. And it -- what I think -- what I think the evidence does show is that he's not willing to accept consequences. And so he might have thought it was an option to some -- that he would somehow manage to get out of this criminal (unintelligible) that he has. But -- and you know, I'm obviously not in his head, but I imagine that that hope is probably diminishing rapidly. And so he's going to have one way to avoid the consequence of the criminal exposure, and that is to flee. And he has contacts in other countries. He has substantial financial ability to do so. And he has the ability to go into -- if he gets out of the U.S., he has got the ability to go into a consulate and get another passport to be

1    able to travel internationally.

2    THE COURT:  Pretrial services is also proposing adding

3    internet devices be -- so what pretrial is proposing, along

4    with a third-party custodian, is not use or possess any devices

5    with internet capabilities to include Smartphones and that all

6    internet capable devices in the household must be password

7    protected.  And so if that condition were in place with the

8    third-party custodian monitoring it, again, what's the response

9    as far as diminishing his ability to create false documents, et

10   cetera?

11   So you have made your argument as far as the timing

12   and the response that he didn't flee since he became aware of

13   the investigation, but why are those conditions not sufficient

14   to mitigate risk of flight?

15   MR. SNELL:  Because they would rely on Mr. Sosa to

16   follow them.  And he has a history of not following -- not

17   following laws and rules.  I just can't -- it would not seem

18   consistent with his past conduct that if he is ordered to do

19   something that he will follow that order if he doesn't want to

20   follow that order.  And so all the devices are password

21   protected and locked, I don't think that -- it would be

22   incredibly difficult to guarantee that he doesn't get more

23   devices.  And having a custodian look after that, I think is a

24   giant task for the custodian, despite their best efforts.

25   And that actually brings another -- I mean, I don't

think that Ms. Sosa understands what the devices that Mr. Sosa

has.  It is my understanding that there is -- he has -- I think

he has a lot of cameras.  But he has a hidden camera in the

house it is my understanding filming the toilet in their

bathroom.  And we have no reason to believe that Ms. Sosa is

aware of that.  And so Mr. Sosa's ability to obtain devices,

hide devices, and use devices in contravention of court orders

is something that I think is likely.

THE COURT:  Okay.  Thank you.

Mr. Briskman.

MR. BRISKMAN:  Your Honor, as the Court knows, the

weight of the evidence is not the central factor when deciding

bond.  We urge this Court to follow the recommendations of

pretrial.

THE COURT:  Mr. Briskman, can I stop you?  Is it

possible to put the -- that elmo down?  I just can't see

Mr. Briskman.  Is it possible -- perfect.  Okay.

I'm sorry, Mr. Briskman I couldn't see you, and so it

is just easier if I can see facial expressions.  So you can

start over, and thank you.

MR. BRISKMAN:  Judge, the weight of the evidence is

not the central factor when deciding bond.  We urge this Court

to follow the recommendations of pretrial, which we think are

sufficient to mitigate the flight of risk.  In terms of the

flight of risk, as counsel mentioned, the United States is not

1    in formal relations with Venezuela, so I'm not -- it is my

2    understanding that he wouldn't be able to go into a consulate

3    and renew a passport here in the United States.

4           We are ready, willing, and able, as pretrial

5    suggested, to surrender any type of passport or travel

6    document.  And so with respect to the flight of risk, we think

7    turning over will certainly mitigate that.

8           He has been living in the same house with his wife

9    since March of 2019.  He has the intention to fight this case

10   and to appear in court each time.  As your Honor mentioned,

11   this is not a presumption case.  This case does not involve any

12   type of violent allegations or narcotics.

13          Judge, as the Court alluded to, your Honor, he has

14   stayed in the same place since the raid in November of 2024.

15   He contacted us immediately and he retained counsel, and we

16   have been in contact with the government.  He has maintained

17   contact with us and has not tried to flee in any way.

18          The 2013 case that he had, there is no allegation of

19   not complying with the probation or not showing up to court

20   after he had been notified.

21          In terms of allegations of child pornography, after

22   the raid on his office, DCFS opened the investigation and they

23   conducted an investigation and they made an unfounded

24   determination, Judge, and the investigation was closed.  We

25   think that that is indicative of the government's lack of

1  evidence related to the child pornography.

2       THE COURT:  In what way?  I mean, again, the way it

3  was explained to me by the government, it goes to whether or

4  not those children are not his children and not residents are

5  in danger, not as to DCFS weighing in on whether or not what

6  was found on these electronic devices meets the federal legal

7  definition of child pornography, right?

8       MR. BRISKMAN:  Well, we believe -- it is my

9  understanding that the DCFS agent did it in the investigation

10  into the allegations of potential child pornography, your

11  Honor.  And the DCFS agent conducted that investigation, made

12  60-day recommendations related to supervision, and then closed

13  that investigation, Judge.  So that's certainly indicative of

14  something of -- of the DCFS agent not finding anything that

15  would put his children at risk.

16       In terms of text messages to employees, Judge, he

17  certainly wasn't coaching them to lie.  He -- he -- that -- I

18  didn't see that in the text messages.  Your Honor, this -- as

19  the Court knows, it is the Court's obligation to look at the

20  least restrictive conditions to ensure his appearance in court.

21  And we believe that we urge the Court to follow the

22  recommendations of pretrial.  He -- these are very -- there are

23  a number of conditions which go over each aspect of his life.

24  And if he were to violate one of the conditions, certainly we

25  would be back here.  So we're asking for the opportunity,

1    Judge, to be put under the conditions of pretrial and to show

2    the Court that he can comply and appear in court.  Thank you.

3            THE COURT:  Is Mrs. Sosa willing to come to the podium

4    and answer questions?

5            Hi, could you just state your name, please?

6            MRS. SOSA:  Sure.  Michelle Sosa.

7            THE COURT:  Thank you, Ms. Sosa or Mrs. Sosa.

8            And you are -- what's your relationship to this

9    defendant?

10           MRS. SOSA:  Wife since 2015.

11           THE COURT:  You have been present during this entire

12   detention hearing, correct?

13           Sorry, I need an audible answer.

14           MRS. SOSA:  Yes.

15           THE COURT:  You heard the government's presentation of

16   evidence, correct?

17           MRS. SOSA:  Yes, I did.

18           THE COURT:  I understand from pretrial services as

19   well as from Mr. Sosa's attorney that you are willing to serve

20   as a third-party custodian.

21           MRS. SOSA:  Yes.

22           THE COURT:  In your own words, what does that mean?

23           MRS. SOSA:  If there -- if he were to do anything that

24   violates any of the conditions, it is my responsibility to

25   report that and it is my duty to uphold as best I am able to to

1  like go through with those conditions.  That's my

2  understanding.

3         THE COURT:  So essentially if he violates any of these

4  conditions by taking on this role, you're representing to the

5  Court that if are you aware of him violating any conditions,

6  you're going to alert pretrial or the Court of that?

7         MRS. SOSA:  Yes.

8         THE COURT:  And that's a pretty hard thing to do on

9  someone that you are in a romantic relationship with and share

10 children, right?

11        MRS. SOSA:  Yes.

12        THE COURT:  And you think you could do that?

13        MRS. SOSA:  Yes.

14        THE COURT:  Do you -- I'm not trying to embarrass you

15 at all, but there were a lot of allegations today about stuff

16 that I think you were in the dark about or basically, as

17 alleged, Mr. Sosa just really misrepresented to you.

18        MRS. SOSA:  Yes.

19        THE COURT:  Do you think you can monitor him?

20        MRS. SOSA:  Yes.

21        THE COURT:  Why?

22        MRS. SOSA:  The -- my priority is my children and

23 their relationship with him.  And he is a huge, huge part of

24 their lives and a very present part of their lives and spent,

25 you know, lots and lots and lots of time spent doing things

1    with them.  And if -- I feel it is my responsibility to promote

2    and continue that relationship while I can.

3            THE COURT:  I understand your prioritization of the

4    kids, which I commend, but my question is a little bit

5    more -- my question is directed to you.  He seems to have

6    misled you and affirmatively, like, misled you.

7            MRS. SOSA:  Yes.

8            THE COURT:  And again, these are just allegations.

9    But why do you think you're going to be able to monitor him?

10   Like, I get that you take this responsibility seriously.  But

11   why do you think you can monitor him?

12           MRS. SOSA:  I think that also, like, depending upon

13   the condition, like I am aware of what exactly that would look

14   like.

15           THE COURT:  So the conditions include that he's not to

16   possess -- here, I want to get the language right.  He's not to

17   possess any devices with internet capabilities to include

18   Smartphones, and that all internet capable devices in the

19   household must be password protected, and meaning that he also

20   can't obtain a new or electronic device.

21           MRS. SOSA:  Yes.

22           THE COURT:  And you think you could monitor that?

23           MRS. SOSA:  Yes.

24           THE COURT:  Is anyone forcing you to serve as a third-

25   party custodian or have him back in the house?

1          MRS. SOSA:  No.

2          THE COURT:  You're doing this of your own free will?

3          MRS. SOSA:  Yes, free will, yes.

4          THE COURT:  Okay.  Thank you for answering my

5     questions.

6          MRS. SOSA:  Yes.

7          THE COURT:  Mr. Briskman, just in light of that, is

8     there anything else you want to argue?

9          It is okay if you don't, I just -- but that was

10    additional, so I just wanted to know if there was anything else

11    you want to say.

12         MR. BRISKMAN:  No, your Honor.

13         THE COURT:  Okay.  Mr. Snell.

14         MR. SNELL:  Yes, your Honor.  With respect to the

15    viability of Ms. Sosa being a custodian, I appreciate the

16    motives and the goals.  I think the problem is that Ms. Sosa is

17    a teacher.  She -- she, you know, teaches at a school during

18    the day.  Mr. Sosa would have to be essentially watched 24

19    hours a day to confirm that he's not getting electronic devices

20    and using them from outside.  I think that that's just a very

21    difficult thing, difficult thing to assure, especially if he is

22    going to have to be left alone for substantial parts of the

23    work week.

24         Just going a few points from counsel's presentation.

25    The 2013 case, Mr. Sosa appeared at hearings, but he was

1   extradited and he was in custody.  So he was there necessarily.

2   The Department of Children and Family Services, touching on

3   that for a second.  So DCFS was notified the first time that

4   suspected child pornography was found, which was in December of

5   2024 on the Mac, iMac desktop from Mr. Sosa's office.  So to my

6   knowledge and my understanding of the situation, I was not

7   personally in contact with them at that time, the agent that is

8   working on that part the investigation was.  And they were just

9   generally notified about the existence of child pornography on

10  the device.  I don't even know if it was attributed exactly to

11  who that device belonged because there is requirements that

12  they be immediately notified.

13          So my understanding is they went and interviewed the

14  children to try to determine if the children had been in any

15  way harmed.  And my understanding is their determination on

16  that was that they did not find that indication.

17          And with respect to the child pornography that

18  (unintelligible) today, there is no belief that he was

19  producing it.  But -- and I don't have reason to believe that

20  will change with the next four devices that are now being

21  reviewed.

22          But the issue with the -- the reason that that has not

23  all been run down to date is a function of the number of

24  devices, which was 19 total.  And it was five of which so far

25  that this has been detected on.  The need for a filter team to

1   initially review the devices, which then when that's found

2   causes everything shut down, causes a need to go back to office

3   of enforcement operations for search warrant review because

4   there could potentially be material that a client provided him

5   believing he was an attorney, believing it was privileged, and

6   so slows that down. And so that's why it is just now getting

7   to be reviewed.

8        But DCFS, to my knowledge, and they have seen none of,

9   like, the actual evidence regarding that, they -- their

10   conclusions are based on their interviews with his children.

11   And that's why the government is not intending that he is a

12   danger to the community at this point based on the information

13   we have. It just -- I think it does factor into his own

14   calculus as to the criminal exposure of these cases.

15        And then lastly the -- I -- the interpretation of the

16   text messages that are Government Exhibit 3 as not approaching

17   an employee to lie, the government's interpretation is

18   different. I mean, he -- the first -- the second affirmative

19   statement that he made on November 1st was you don't know

20   anything. I think that telling an employee he was a

21   co-conspirator, that you don't know anything is telling the

22   employee to lie from the government's perspective. And I think

23   the government just submits that Mr. Sosa will go to great

24   lengths to avoid consequences. And at this point the only

25   length that he can go to to avoid those consequences is flight.

1       And for that reason, based on his general documented

2   history, the government believes that by preponderance of

3   evidence there is no condition or combination of conditions

4   that could assure his appearance.  Thank you.

5       THE COURT:  Mr. Snell, is Government Exhibit 2, just

6   to be clear, this is a photograph?

7       MR. SNELL:  Right.  That's the photograph of him at

8   USCIS on April 17th.

9       THE COURT:  Okay.  Okay.  I am -- I did not intend to

10  drag this out much, but I need to spend more time with these

11  exhibits, and I want to consider the arguments made today.

12  This is a much closer call than I think the majority of

13  detention hearings are.  And I just need more time to think

14  about this, and I will make a decision by tomorrow.

15      And I have another detention hearing starting at 2:30

16  with an in-custody defendant and an initial that I have got to

17  do today, so I just can't bring you back in like an hour

18  because I'm not going to have an hour to spend on this.

19      So what I would like to do is, I can continue this by

20  phone to give you my ruling or I can bring you back in person.

21  And I am just trying to make this easier for scheduling.  And I

22  also am hopeful that the marshal, if it is in person that

23  the -- because I realize it is 2:30, that we can get him on the

24  list to come back to court tomorrow.  I could do this at noon

25  tomorrow.

1          MR. SNELL:  The government could be available.

2          THE COURT:  Mr. Briskman, do you have a preference, in

3   person or phone and also does that time even work for you?

4          MR. BRISKMAN:  A little bit later than noon is better

5   for me, Judge, tomorrow, your Honor.

6          THE COURT:  How much later?

7          MR. BRISKMAN:  By phone, 1:00 o'clock.

8          THE COURT:  Yeah, I can do 1:00 o'clock.

9          Does that work for you, Mr. Snell?

10          MR. SNELL:  I believe so.  Just one second.

11          THE COURT:  Yeah.

12          MR. SNELL:  Yes, it does.  Thank you.

13          THE COURT:  All right.  So it will be by phone.  And

14   I'm going to order -- or actually now that we're post pandemic.

15   Sorry, this is a question for my courtroom deputy.  Can we have

16   Ms. Sosa from wherever he is being housed by phone or does he

17   have to -- do we have to do this in person?

18          (Discussion off the record.)

19          THE COURT:  So Mr. Sosa, you're going to stay wherever

20   you're housed, but you'll participate by phone as well.  Okay?

21          And Mr. Briskman, the dial-in information will be

22   provided in the minute order.  But if there are any concerns

23   and also if family members or anyone else need to dial in, it

24   will be open to the public by phone, so anyone is welcome to

25   dial in.

1          But we'll continue this telephonically till 1 P.M.

2   tomorrow.

3          Is there anything else to be noted at this time?

4          MR. SNELL:  Not from the government.  Thank you.

5          THE COURT:  Okay.  Anything further from the defense,

6   Mr. Briskman?

7          MR. BRISKMAN:  No, your Honor.

8          THE COURT:  Okay.  And to pretrial services, Officer

9   Bert, I just want to say thank you.  I realize this was a

10  really quick turnaround on the pretrial services report, which

11  had a lot of nuance to it and issues that we don't see all the

12  time, so thank you so much for your time and diligence in

13  producing the report in time for today's hearing.  I appreciate

14  it.

15         MS. BERT:  Of course, your Honor.  Thank you.

16         THE COURT:  Okay.  Thank you so much.  We're

17  adjourned.

18      (Which concluded the proceedings.)

19                      CERTIFICATE

20         I certify that the foregoing is a correct transcript
    from the digital recording of proceedings in the above-entitled
21  matter to the best of my ability, given the limitation of using
    a digital-recording system.

22

23  /s/Pamela S. Warren                    May 19, 2025
    Official Court Reporter - Retired           Date
24  United States District Court
    Northern District of Illinois
25  Eastern Division